UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ARGIRO DE JESUS VELASQUEZ-<br>VELASQUEZ, et al.<br><br>Defendants | Crim. No. 22-cr-10060-RGS |

**AFFIDAVIT IN SUPPORT OF
PRE-TRIAL DETENTION**

**Introduction and Background**

I, Ryan Talbot, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been so employed since August 1998. My responsibilities as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Laws (26 U.S.C. § 7201 *et seq.*), the Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*), the Money Laundering Control Act (18 U.S.C. §§ 1956, 1957, and 1960), and related offenses. I have completed 24 weeks of specialized training at the Federal Law Enforcement Training Center in Glynco, Georgia, where I received extensive training in conducting criminal investigations. Topics covered included the investigation of financial crimes such as tax evasion, failure to collect or pay over taxes, filing of false tax returns, failure to file tax returns, money laundering, and conspiracy to commit tax and other crimes. I also received instruction on probable cause as it relates to search and seizure warrants and arrest warrants. During my employment with IRS-CI, I have conducted and/or assisted in criminal investigations involving tax fraud, identity theft, money laundering, violations

1

of the Bank Secrecy Act, and other federal violations. I have conducted and/or assisted in the execution of numerous search and arrest warrants.

2.  Since January 2005, I have been assigned to the Drug Enforcement Administration (DEA) Financial Investigations Group (FIT). I have conducted and/or participated in investigations of persons and organizations involved in narcotics trafficking and money laundering activities. I have conducted and/or participated in investigations of companies that are involved in the money laundering of proceeds derived from narcotics trafficking. I have attended conferences related to the investigation of asset forfeiture and money laundering. I am familiar with the books, records, and documents that businesses are required to maintain. I am also familiar with the reports that are required to be prepared for government agencies.

3.  Based upon my training and experience I know that narcotics traffickers amass large amounts of cash proceeds from the sale of narcotics and attempt to legitimize these proceeds by laundering the profits. Narcotics traffickers also at times utilize domestic and foreign banks or financial institutions with attendant services, including sales of securities, cashier checks, money drafts, letters of credit, and other financial instruments. I also know that unexplained wealth is probative evidence of trafficking in controlled substances.

4.  Narcotics traffickers accumulate large amounts of cash proceeds from the sale of narcotics in the United States. The traffickers, or those associated with the traffickers, frequently attempt to create the appearance of legitimacy to those proceeds; (*i.e.*, "launder" them by making them appear to have been generated by a legitimate source). The traffickers must also devise various methods to remit those narcotics proceeds to suppliers of narcotics located in Colombia and other South American countries, which are known source locations of narcotics, without

alerting governmental or law enforcement agencies in either the United States or the South American countries.

5. In order to accomplish this goal, narcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions in an attempt to make their narcotics profits appear to be from legitimate sources and to move those profits through the financial system into the countries where the narcotics are manufactured.

6. One method of laundering narcotics proceeds is for narcotics traffickers to use a third party to "sell" their narcotics proceeds in the United States for pesos in Colombia. This practice, commonly known as the Black Market Peso Exchange ("BMPE"), is centered on a BMPE broker who can bring the drug proceeds and the legitimate pesos together. In a common BMPE conspiracy, a BMPE broker will identify a South American businessperson, who imports goods from places such as the United States, China, or Panama. The BMPE broker will offer the South American businessperson an opportunity to pay the debt owed to the exporter in the foreign country at a significant discount compared to making the payment through a South American bank. The South American businessperson who agrees to this scheme will then turn over the payment for the imported goods in the form of pesos to the BMPE broker who in turn will contact a Drug Trafficking Organization ("DTO"). When the BMPE broker contacts the DTO, the broker will offer the pesos in South America in exchange for the narcotics proceeds that are located in the United States.

7. The BMPE broker will then arrange to have the narcotics proceeds picked up by a member of the BMPE broker's organization. These money pick-ups will usually occur between two people who have never met before and will most likely never meet again. These pick-ups

frequently involve several hundred thousand dollars. Following the money pick-up, the BMPE broker arranges to forward those proceeds to the exporter in the United States, which is frequently accomplished by remitting those proceeds to the exporter through a third party. Frequently, these third parties are found in different geographical locations than the exporter, often where the DTO is located, which avoids the transportation of illicit dollars (proceeds) to the location where the exporter is located.

### Purpose of the Affidavit

I make this affidavit in support of pre-trial detention of defendants (1) ARGIRO DE JESUS VELASQUEZ-VELASQUEZ, a/k/a "El Viejo," (2) JOSE FERNANDO SANCHEZ-VILLANUEVA, a/k/a/ "Picapiedra," (4) OSCAR IVAN RODRIGUEZ-CAMARGO, a/k/a "El Mono," (5) WILLIAN FAUSTINO ACOSTA-CALDERIN, (6) MANUEL CALDERIN-CALDERIN, (8) ABDUL MAURICIO HARB-GOMEZ, (9) ANDRES RACHED FARAH, a/k/a/ "Don Andres," a/k/a "El Turco," (10) FERNANDO CARLOS PERTUZ-HERRERA, (11) YIMMY RAFAEL SANCHEZ-JIMENEZ, a/k/a "El Chiqui," (12) JAIME HUMBERTO MEJIA-BENCARDINO, (13) JOSE ALIRO ABRIL-SEQUERA, (14) HAROLD ANTONIO AYALA-PINEDO, (15) ST DEVON ANTHONY COVER, (16) DENNIS RAYMOND ROWE, (17) SEIVRIGHT DONALD AFFLICK, (18) ROBERT HUETON COLESPRING, (19) KIMALI ST GEORGE MYERS, and (20) DAWNETT ROCHELLE MCGEE. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to present facts supporting pre-trial detention of the defendants and does not set forth all of my knowledge about this matter.

## Background of the Investigation

8. In or about October 2016, law enforcement began an investigation into a sophisticated money laundering organization located primarily in Barranquilla, Colombia. Specifically, investigators learned of a number of individuals in Barranquilla that had close relationships with businesses in Colombia. Those individuals could provide money launderers with corporate bank accounts in Colombia that would receive wire transfers through intermediary banks in the United States, the Caribbean, and Europe and pay out as directed in Colombia.

9. Through the use of confidential sources, cooperating witnesses, and undercover investigators, law enforcement in the United States, Colombia, Jamaica, the Dominican Republic, Spain, Canada, and elsewhere successfully infiltrated the money laundering organization. Members of the money laundering organization used a variety of methods in an attempt to thwart law enforcement, to include the use of encrypted communication platforms. Nevertheless, between 2016 and 2021, law enforcement obtained hundreds of recorded communications involving the defendants charged in this indictment through a combination of consensually recorded telephone calls, text messages, wiretap interceptions, and in-person meetings.

10. During the course of the investigation, the defendants laundered over $6 million through the United States banking system, including through banks in the District of Massachusetts. Through monitoring the activity of the defendants and during the course of the investigation, investigators were able to seize and forfeit over $1 million from corporate bank accounts and other investigative activity. Additionally, investigators were able to seize or trace seizures of nearly 3,000 kilograms of cocaine back to the money laundering organization. The minimum street value of that cocaine in the United States is over $90 million.

### The Organization

11.  Based upon my training and experience, I know that money laundering organizations have loosely defined roles and responsibilities. The roles and responsibilities of members of the organization can change over time, as needs and opportunities arise. Attached to this affidavit as Exhibit A is a visual chart of the individuals charged in this indictment and their respective roles.

12.  Defendants ARGIRO DE JESUS VELASQUEZ-VELASQUEZ ("VELASQUEZ-VELASQUEZ") and JOSE FERNANDO SANCHEZ-VILLANUEVA ("SANCHEZ-VILLANUEVA") were drug suppliers and participated in laundering the proceeds of narcotics trafficking. At times, VELASQUEZ-VELASQUEZ and SANCHEZ-VILLANUEVA worked together to repatriate the proceeds of narcotics trafficking to Colombia, including traveling to Jamaica and overseeing the transfer of bulk currency. During the course of the investigation, VELASQUEZ-VELASQUEZ laundered over $750,000 in drug trafficking proceeds through the United States banking system. SANCHEZ-VILLANUEVA laundered over $1.7 million in drug trafficking proceeds through the United States banking system. Additionally, on July 3, 2019, law enforcement seized approximately 1,193 kilograms of cocaine at sea, sixty miles south of Jamaica. Pictures of that seizure are attached to this affidavit as Exhibit B. Based on subsequent recorded conversations with VELASQUEZ-VELASQUEZ and SANCHEZ-VILLANUEVA and additional investigation, I know that VELASQUEZ-VELASQUEZ and SANCHEZ-VILLANUEVA were involved in the shipment of the cocaine seized by law enforcement on July 3, 2019.

13.  Defendant OSCAR IVAN RODRIGUEZ-CAMARGO was a money broker and

facilitator who participated in laundering the proceeds of drug trafficking. During the course of the investigation, RODRIGUEZ-CAMARGO was directly involved in laundering over $3 million in drug trafficking proceeds through the United States banking system. RODRIGUEZ-CAMARGO also facilitated the use of companies in Colombia that could receive wire transfers and pay out proceeds in Colombia. Defendant WILLIAN FAUSTINO ACOSTA-CALDERIN ("ACOSTA-CALDERIN") was the legal representative of one of those companies in Colombia that shipped scrap metal internationally. During the course of the investigation, ACOSTA-CALDERIN was involved in the receipt of over $1.5 million in drug trafficking proceeds through the United States banking system. ACOSTA-CALDERIN also created or transmitted fake documentation on behalf of the company that would help justify the receipt of those funds and circumvent the anti-money laundering protocols of the financial institutions that were used in the scheme. Additionally, on March 13-15, 2019, the Colombian National Police selected nine containers for secondary inspection at the Port of Buenaventura, Colombia due to irregularities. Those containers were all owned by the scrap metal company associated with RODRIGUEZ-CAMARGO and ACOSTA-CALDERIN. Within five of those containers, police found scrap metal intermingled with hundreds of rusted metal cylinders. The metal cylinders were drilled and opened and found to contain a total of 1,555 kilograms of cocaine. This method of concealing cocaine matched a method that RODRIGUEZ-CAMARGO described in a recorded conversation. Pictures of that seizure are attached to this affidavit as Exhibit C.

14. Defendant MIGUEL CALDERIN-CALDERIN ("CALDERIN-CALDERIN") was the legal representative of a second company in Colombia that received the proceeds of drug trafficking through United States-based wire transfers. During the course of the investigation,

CALDERIN-CALDERIN was involved in the receipt of over $300,000 in drug trafficking proceeds through the United States banking system. CALDERIN-CALDERIN also created or transmitted fake documentation on behalf of the company that would help justify the receipt of those funds and circumvent the anti-money laundering protocols of the financial institutions that were used in the scheme.

15. Defendant GERMAN MILLAN-PADILLA ("MILLAN-PADILLA") was a money broker who participated in the laundering of the proceeds of drug trafficking. During the course of the investigation, MILLAN-PADILLA was directly involved in laundering over $3.5 million drug trafficking proceeds through the United States banking system.

16. Defendant ABDUL MAURICIO HARB-GOMEZ ("HARB-GOMEZ") was a money broker who participated in the laundering of the proceeds of drug trafficking. HARB-GOMEZ also owned and/or controlled multiple corporate accounts located in Colombia that received wire transfers from the United States of drug trafficking proceeds. During the course of the investigation, HARB-GOMEZ was directly involved in laundering over $2.5 million in drug trafficking proceeds through the United States banking system. Defendant ANDRES RACHED FARAH ("FARAH") was a facilitator who worked with HARB-GOMEZ and other co-defendants to launder drug trafficking proceeds. Defendant FERNANDO CARLOS PERTUZ-HERRERA ("PERTUZ-HERRERA") was a Colombia-based money courier who worked for HARB-GOMEZ and made currency payouts in Colombia at the end of the repatriation process.

17. Defendant YIMMY RAFAEL SANCHEZ-JIMENEZ ("SANCHEZ-JIMENEZ") was a money broker who participated in the laundering of the proceeds of drug trafficking. During the course of the investigation, SANCHEZ-JIMENEZ was directly involved in laundering

8

over $600,000 in drug trafficking proceeds through the United States banking system.

18. Defendant JAIME HUMBERTO MEJIA-BENCARDINO ("MEJIA-BENCARDINO") was a money broker who participated in the laundering of the proceeds of drug trafficking. During the course of the investigation, MEJIA-BENCARDINO was directly involved in laundering over $1.7 million in drug trafficking proceeds through the United States banking system.

19. Defendant JOSE ALIRO ABRIL-SEQUERA ("ABRIL-SEQUERA") was the owner of a company in Colombia that received the proceeds of drug trafficking through United States-based wire transfers. During the course of the investigation, ABRIL-SEQUERA was involved in the receipt of over $250,000 in drug trafficking proceeds.

20. Defendant HAROLD ANTONIO AYALA-PINEDO ("AYALA-PINEDO") was the owner of a company in Colombia that received the proceeds of drug trafficking through United States-based wire transfers. During the course of the investigation, AYALA-PINEDA was involved in the receipt of over $150,000 in drug trafficking proceeds.

21. Defendants ST DEVON ANTHONY COVER ("COVER"), DENNIS RAYMOND ROWE ("ROWE"), SEIVRIGHT DONALD AFFLICK ("AFFLICK"), ROBERT HUETON COLESPRING ("COLESPRING"), KIMALI ST GEORGE MYERS ("MYERS"), and DAWNETT ROCHELLE MCGEE ("MCGEE") were money couriers. During the course of the investigation, each of the money couriers delivered drug proceeds in the form of bulk currency to an undercover investigator and/or confidential informant, in the amounts set forth below:

| Defendant Name | Approximate Amount of Bulk Currency Delivered |
| --- | --- |
| ST DEVON ANTHONY COVER | $268,000 |

| | |
|---|---|
| DENNIS RAYMOND ROWE | $606,000 |
| SEIVRIGHT DONALD AFFLICK | $650,000 |
| ROBERT HUETON COLESPRING | $575,000 |
| KIMALI ST GEORGE MYERS | $400,000 |
| DAWNETT ROCHELLE MCGEE | $250,000 |

Attached to this affidavit as Exhibit D are photographs of the bulk currency delivered by the individual money couriers charged in this indictment.

## CONCLUSION

22. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to present facts supporting the pre-trial detention of the above-named defendants and does not set forth all of my knowledge about this matter.

Signed under pains and penalties of perjury this 23 day of May, 2022.

*Ryan Talbot*
Ryan Talbot, Special Agent
IRS-Criminal Investigations